IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHESTER O'QUINN,                      )
                                      )
                  Plaintiff,          )
                                      )
vs.                                   )      **Case No. 3:19 -CV-01010 -MAB**
                                      )
VANDERHOVE, ET AL.,                   )
                                      )
                  Defendants.         )

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Chester O'Quinn, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Dixon Correctional Center, brings this civil action pursuant to 42 U.S.C. §1983, for events that occurred while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). He seeks monetary damages and injunctive relief.

Currently before the Court is Plaintiff's motion to amend the complaint (Doc. 20) and Plaintiff's motion for preservation of evidence (Doc. 21). For the reasons set forth below, Plaintiff's motion to amend the complaint is **GRANTED** (Doc. 20). Plaintiff's motion for preservation of evidence is denied as **MOOT** (Doc. 21).

## MOTION TO AMEND THE COMPLAINT

The Federal Rules of Civil Procedure instruct that leave to amend should be freely given when justice so requires. FED. R. CIV. P. 15(a)(2). The Court can deny a plaintiff leave to amend the complaint, however, if there is undue delay, bad faith, or dilatory motive,

if the plaintiff repeatedly failed to cure deficiencies in the complaint, if the opposing party would suffer undue prejudice, or when the amendment would be futile. *Mulvania v. Sheriff of Rock Island Cty.*, 850 F. 3d 849, 855 (7th Cir. 2017) (quoting *Arreola v. Godinez*, 546 F. 3d 788, 796 (7th Cir. 2008)). "The decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court." *Aldridge v. Forest River, Inc.,* 635 F.3d 870, 875 (7th Cir. 2011) (quoting *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002)).

Plaintiff filed his original complaint on September 16, 2019 (Doc. 1). Following a threshold review of Plaintiff's complaint pursuant to 28 U.S.C § 1915A, Plaintiff was permitted to proceed on the following counts:

**Count 1:**    First Amendment claim against Defendant Duvall for placing Plaintiff in segregation in retaliation for filing grievances.

**Count 2:**    Eighth Amendment claim against Defendant Vanderhove for the use of excessive force.

(Doc. 12).

The Court noted in its Order that it appeared as if some of Plaintiff's pages in the complaint were missing (Doc. 12, p. 3). Plaintiff filed a motion to amend his complaint on May 18, 2020, detailing for the Court that he intended to include additional Defendants in the caption, but had inadvertently only included them in the body of his complaint (Doc. 20). Additionally, he explained that, as the Court indicated, some of the pages of his original complaint were missing. *Id.* Defendants have not filed any objections to Plaintiff's motion. Given that, and the instruction that leave to amend should be freely

given when justice so requires, FED. R. CIV. P. 15(a)(2), the Court **GRANTS** Plaintiff's

Motion for Leave to File an Amended Complaint (Doc. 20).

<u>Missing Information from Previous Complaint</u>

The missing pages from Plaintiff's complaint are as follows: 1) the full list of

Defendants, which should include Warden Jaimet, C/O Martin, C/O Menendez, C/O

Huff, Counselor Eldridge, Lt. Pierce, Lt. Coffee, Lt. Mayer, and IDOC Director John

Baldwin, in addition to the current Defendants Duvall and Vanderhove; 2) pages 4B, 4C,

4F-4K, and 4M of the Complaint; and 3) approximately 66 pages of exhibits.[1]  Consistent

with his original Complaint, Plaintiff describes events that occurred at Pinckneyville from

approximately July 1, 2017 through January 31, 2018.

<u>Complaint</u>

O'Quinn states he has been diagnosed as seriously mentally ill and has multiple

physical disabilities (Plaintiff's Proposed Amended Complaint, p. 5).[2]  He also suffers

from diabetes, hypertension, neural disorder, and degenerative disc disease. There are

times he can barely walk, and he uses a quad cane to get around. In the Complaint, he

alleges that the following took place between July 1, 2017 and January 31, 2018 at

Pinckneyville. *Id.* Throughout the issues described here, O'Quinn was on crisis watch or

---

[1] Plaintiff's complaint (Doc. 1) has exhibits and supporting materials from approximately page 9 through 20. The proposed amended complaint includes exhibits and supporting materials from approximately page 21 through 98.
[2] Plaintiff's proposed amended complaint was submitted to the Court via email or mail and is not currently on the docket.

hunger strike and housed in the healthcare unit or unit 6B. Throughout the issues described here, he contends he was also subjected to harsh living conditions (*Id.* at p. 15).

In early July 2017, O'Quinn was placed on suicide watch and details that prisoners who either go on hunger strike or express suicidal thoughts are subjected to extremely harsh conditions. While on suicide watch, O'Quinn was placed in a cell covered with fecal matter and was given a mattress covered in urine and fecal matter to sleep on (*Id.* at 6). O'Quinn showed Correctional Officer Duvall the mattress and cell. Duvall expressed that he did not care about the conditions of O'Quinn's cell. The cell had bugs in it that bit O'Quinn. During this time, O'Quinn declared a hunger strike because he was not receiving the same nutritious meals as the general population. Duvall refused to record the hunger strike, and his hunger strike was only recorded a few days later after a medical professional stepped in and asked another officer to record it. *Id.* Duvall refused to give Plaintiff his legal or personal mail until O'Quinn ended his hunger strike and was off of suicide watch. *Id.* O'Quinn details that he was deprived of all personal and legal mail for more than sixty days by Duvall and Correctional Officer Huff, causing him to miss court and grievance deadlines. Some of O'Quinn's grievances were ready to go in the final stages of appeal, but because he was deprived of his mail, he did not have access to them. O'Quinn was also not able to access his grievances or file them while on crisis watch. *Id.*

On or around July 5, 2017, Lieutenant Coffee refused to give O'Quinn his cane so he could walk to have his insulin checked. O'Quinn describes having to hold onto "box chucks" that hang from cell doors as he stumbled and fell down as he walked to get his blood checked. At one point, O'Quinn fell on his face, hurting himself. Correctional

Officer Daugherty helped him up while Coffee assaulted O'Quinn by pulling him by his handcuffs. O'Quinn reported this assault to Mental Health, who communicated these issues to Internal Affairs, but it took over a month and a half for Internal Affairs to make a report (*Id.* at 6).

During the summer, O'Quinn describes that it was 95 to 100 degrees on some days and Duvall refused to give him ice and forced him to walk barefooted to have his insulin checked. Once O'Quinn wrote grievances about these issues with Duvall, Duvall began to retaliate in the following ways: 1) Duvall refused to allow O'Quinn to use the shorter ADA route for disabled prisoners; 2) Duvall refused to allow O'Quinn to go straight to the chow hall to eat after taking his insulin in the Healthcare Unit, making O'Quinn return to his unit where Duvall then refused O'Quinn a dinner tray, which made O'Quinn shake and sweat from low blood sugar; 3) Duvall refused to allow O'Quinn an ADA shower; and 4) Duvall wrote a disciplinary ticket in August or September 2017 against O'Quinn, which the Adjustment Committee realized was an error only after O'Quinn was called before the committee and they conducted an investigation (*Id.* at p. 7). The disciplinary ticket was meant for another inmate (*Id.* at pp. 6-7).

Duvall placed O'Quinn in segregation in retaliation for writing grievances after shaking down O'Quinn's cell, stating to O'Quinn that he was looking for something to send him to segregation (*Id.* at p. 7). While in segregation, on September 27, 2017, O'Quinn asked for a crisis team member because he was feeling suicidal. Lieutenant Pierce ignored the request and accused O' Quinn of not being serious. An hour passed, and O'Quinn told Correctional Officer Martin he was suicidal and wanted to see a crisis

team member. Martin also ignored him and about fifteen minutes later, O'Quinn attempted to kill himself. Martin came to the cell, cuffed O'Quinn, and removed what he says was a noose around his neck. Martin then dragged O'Quinn to the front wing, while O'Quinn was falling and crying out in pain. Martin handed O'Quinn off to Correctional Officer Vanderhove who took him to another wing to speak with a mental health professional (*Id.* at p. 8). During the walk, Vanderhove ignored his disabilities and did not provide him a cane to assist in walking. He dragged O'Quinn when he fell and twisted the handcuffs causing injuries. Vanderhove then took O'Quinn to a room, chained him to a stool, and started beating him. *Id.* Mental Health Professional Rose came in the room and she, Lieutenant Pierce, and Vanderhove took O'Quinn to the healthcare unit (*Id.* at p. 9). O'Quinn had to walk a half mile without his cane to the healthcare unit. During the walk, he fell several times and both officers continually twisted his arms, with O'Quinn crying out in pain. When O'Quinn was taken to crisis watch, Pierce and Vanderhove again twisted and grinded the handcuffs into his wrists causing him to bleed. They also slammed his head against the door before entering the crisis unit. *Id.* Once at the crisis unit, Vanderhove could not get the handcuffs off of O'Quinn. In frustration, Vanderhove stabbed O'Quinn with the key and it went straight through O'Quinn's skin to the bone (*Id.* at p.10). O'Quinn now has permanent damage to the nerves in his hand and wrist, which manifests in loss of feeling and motor control.

Eventually, Vanderhove was able to get the handcuffs off of O'Quinn, but both Vanderhove and Pierce feared they had broken his arms, so they ordered him to take off his clothes and lift his hands over his head. It took three tries, but O'Quinn was finally

able to get some movement back in his arms. While getting undressed, Pierce and Vanderhove made comments about the size of his penis. *Id.* Vanderhove and Pierce also denied O'Quinn use of his cane, front-cuff, and all ADA accommodations (*Id.* at p. 10).

On or around October 28, 2017, O'Quinn declared a hunger strike while on crisis watch (*Id.* at p. 11). On the second day of his hunger strike, Correctional Officer Menendez came to O'Quinn's cell to take him to get his insulin. He had "brig cuffs" and a 12-foot dog chain attached to these handcuffs. Once he put the brig cuffs on O'Quinn, Menendez pulled O'Quinn down the wing like a dog. Nurse Tina checked his blood sugar while Lieutenant Mayer observed, and O'Quinn's blood sugar had dropped twenty points from the day before. O'Quinn informed Nurse Tina that he was on hunger strike and refused to take his insulin. Lieutenant Mayer ordered O'Quinn to take the insulin and ordered him to eat food on a tray he placed in his cell. *Id.* O'Quinn reminded Mayer about protocol, which is that officials are supposed to ask the prisoner if they want a tray of food. Mayer responded that he did not care about protocol and that O'Quinn would eat the food on the tray in his cell. O'Quinn informed Mayer that he would not return to his cell until the food tray was removed. Mayer grabbed the dog chain attached to O'Quinn's handcuffs and escorted him back to his cell, along with Menendez.

O'Quinn could not resist because he was weak and almost naked, only dressed in a smock with no underwear, shoes, or socks because of being on crisis watch (*Id.* at p. 12). Once at the cell, O'Quinn saw that the food tray was on his mattress. He moved to grab it to return it to Menendez and Mayer. Seeing what he was doing, Mayer told Menendez to pull the dog chain, which Menendez did through the chuck hole in the door. At the

same time, Mayer kicked O'Quinn in his penis, causing O'Quinn to fall over in pain. Menendez continued to yank the chain while Mayer assaulted O'Quinn (*Id.* at p. 11). Menendez fractured O'Quinn's forearm and wrist and the repeated yanks of the dog chain cut into O'Quinn, causing blood to spill all over him. O'Quinn suffered a deep cut to the bone on his forearm from the cuffs. O'Quinn repeatedly requested medical treatment and pain medications for this assault, but no one provided him help. He did not receive treatment until weeks or months later (*Id.* at p. 12).

While on crisis watch, O'Quinn struggled to complete grievances due to his status on crisis watch, his disabilities, and the injuries he sustained while on watch. Prison officials, per O'Quinn, repeatedly asked Counselor Eldridge to meet with O'Quinn to help him with his grievances. Finally, on or around October 28, 2017, Counselor Eldridge came to speak with O'Quinn about his complaints. O'Quinn communicated to Eldridge that he needed help writing a grievance about the aforementioned issues, but Eldridge interrupted O'Quinn and interrogated him, refusing to write down what O'Quinn told him because his issues were against his friends, Correctional Officers Martin, Pierce, and Vanderhove (*Id.* at pp. 11-12).    O'Quinn was unable to file a grievance about these issues because Counselor Eldridge thwarted his attempts. *Id.*

O'Quinn was on a hunger strike and crisis watch in October 2017 (*Id.* at p. 12). While on crisis watch, O'Quinn was not provided with the same meals as the general prison population (*Id.* at p. 15). O'Quinn was supposed to receive 2,200 calories per day, but while on crisis watch, he was losing 10 pounds per week because he was not receiving the same food as other inmates. He lost a total of 50 pounds while on crisis watch because

he was only given a spoon of peanut butter, four slices of bread, and a half of a banana every morning for breakfast. *Id*. For lunch and dinner every day, he was given a cold bologna sandwich and a $0.25 bag of chips, as well as a stale cinnamon roll. Additionally, O'Quinn did not receive turkey with all of the fixings on Thanksgiving (*Id*. at pp. 15-16). Correctional Officer Huff came to his cell and ate turkey and pie in front of him. The cold, hard, stale food he was fed contributed to stomach problems, rectal bleeding, and mental anguish. O'Quinn was forced to sleep on a hard plastic contraption and not given a mattress of bed, hurting his back and neck. He was unable to sleep. The cell was dirty and had crickets and spiders. O'Quinn was also not allowed to shower or go outside. Mental health staff told Dr. Butler and Christine Brown about his conditions and treatment, but they did nothing to help him. *Id*.

Also in October 2017, while still on hunger strike and crisis watch, O'Quinn was seen by medical professionals about his assaults. Nurse Marsha Hill stopped the doctor examining O'Quinn and listening to his details about his assaults. She informed the doctor that he should not listen to O'Quinn or believe him, and that there were other prisoners he needed to see. The doctor stopped examining O'Quinn and just wrote down that O'Quinn looked dehydrated and appeared to not be eating (*Id*. at pp. 12-13). O'Quinn informed Nurse Hill that he was bleeding from his rectum, but she refused to help him or do anything to inform the doctor. For more than 10 days, O'Quinn was bleeding from his rectum and his pleas for help were ignored. O'Quinn believes Nurse Hill ignored him as retaliation for writing several grievances against her for not answering prior complaints.

In November 2017, O'Quinn started bleeding from his rectum again. He informed the doctor in the healthcare unit and Nurse Mary Rodgers that he was bleeding for more than seven days and was in so much pain he could not sleep or sit. Nurse Mary Rodgers was completely indifferent to O'Quinn's ailments and refused to help him herself or tell a doctor that he needed help (*Id.* at p. 13).

O'Quinn attempted to speak with Christine Brown, the head of the healthcare unit, about his medical issues, including how he was bleeding from his rectum (*Id.* at p. 14). She never came to see him or address his concerns, despite two nurses and two mental health professionals asking her to see O'Quinn. *Id.*

During this time, Dr. Butler was in charge of the Mental Health Department and the mental health professionals in the prison. The psychiatrist, Dr. Baig, suggested that O'Quinn speak with Dr. Butler. Although Dr. Baig sent her an email and left a note in O'Quinn's file that he would like to speak to Dr. Butler, weeks went by before O'Quinn was able to speak with Dr. Butler (*Id.* at p. 13). Dr. Butler came to see another prisoner in the same crisis unit where O'Quinn was housed, and O'Quinn stopped her. When asked why she had not come to see him, Dr. Butler stated that they were attempting to take away his human rights and have him deemed "unfit" (*Id.* at p. 14). Other mental health professionals informed Dr. Butler that O'Quinn does not need to be committed or on medication, and that he only needs someone to talk to, but she would not listen. *Id.*

O'Quinn repeatedly filed nurse sick call requests throughout this time, attempting to get help for all of the injuries and issues previously outlined, but most nurses did not respond to his sick call requests (*Id.* at p. 16). It was not until around January 1st or 2nd,

2018 that he saw Nurse Lottie for the injuries to his hands, wrists, back, neck, and the nerve damage he suffered. Nurse Lottie also saw O'Quinn for the pain medication he receives for his chronic pain, which he was deprived of for months while on crisis watch. Finally, O'Quinn received an MRI. Nurse Lottie recommended that O'Quinn see the doctor, which was scheduled for January 4th or 5th, 2018, but the appointment was canceled (*Id.* at p. 17). O'Quinn then put in another sick call request and was seen again by Nurse Lottie on January 7, 2018. Nurse Lottie put a doctor's request in, but then informed O'Quinn that Marsha Hill, Mary Rodgers, and Christine Brown told her that it was too soon to see him for his assault injuries, so they canceled the appointment with the doctor. *Id.*

O'Quinn's hands and wrists are in constant pain and it took him over a year to write out his Complaint because pain mediation does not take the pain away. *Id.* The pain is so great that at times, O'Quinn has thoughts of suicide and wishes he was dead so the pain would stop. *Id.* O'Quinn describes experiencing nerve damage and arthritis in his hands that make his hands shake. The injuries to his hands and wrists are visible even to this day. He also has permanent damage to his back, neck, and head because of Defendants' attacks. He suffers from memory loss due to these attacks. *Id.*

<u>Preliminary Dismissals</u>

Plaintiffs are required to associate specific defendants with specific claims, so that defendants are put on notice of the claims brought against them and so they can properly answer the complaint. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); FED. R. CIV. P. 8(a)(2). Where a plaintiff has not included a defendant in his statement of the

claim, the defendant cannot be said to be adequately put on notice of which claims in the complaint, if any, are directed against him. Furthermore, merely invoking the name of a potential defendant is not sufficient to state a claim against that individual. *See Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir. 1998). Plaintiff fails to plead any facts or allegations against K. Jaimet or IDOC Director John Baldwin. Accordingly, those Defendants are **DISMISSED without prejudice**.[3]

Additionally, the Court will not treat parties not listed in the caption as defendants, and any claims against them are dismissed without prejudice. *See Myles v. United States,* 416 F.3d 551, 551-52 (7th Cir. 2005) (to be properly considered a party, a defendant must be "specif[ied] in the caption"). O'Quinn seems to make arguments against a series of medical providers, including Christine Brown, Dr. Butler, Dr. Baig, Nurse Mary Rodgers, and Nurse Marsha Hill. These potential defendants are not listed in the caption and, therefore, the Court will not treat them as parties or analyze potential claims against them. They are also **DISMISSED without prejudice**.

Discussion

Under § 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). The Court must dismiss any portion of the Complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune

---

[3] The Court has jurisdiction to screen the O'Quinn's amended complaint because of his consent to the full jurisdiction of a magistrate judge and the Illinois Department of Corrections' limited consent to the exercise of magistrate judge jurisdiction as set forth in the Memorandum of Understanding between the Illinois Department of Corrections and this Court.

from such relief. 28 U.S.C. § 1915A(b). An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that "no reasonable person could suppose to have any merit." *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *see Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of a plaintiff's claim. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, Courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id*. At the same time, however, the factual allegations of a *pro se* complaint are to be liberally construed. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Plaintiff is not required to include "specific facts" in his complaint. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (citation omitted). Rather, to satisfy the notice pleading standard of Rule 8(a)(2), Plaintiff just has to "give enough details about the subject-matter of the case to present a story that holds together" and provides

the defendants "fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (citation omitted); Fᴇᴅ. R. Cɪᴠ. P. 8 (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

The Complaint raises a laundry list of claims against several individuals. As best the Court can tell, Plaintiff sets forth the following allegations:

**Count 1:** First Amendment claim against Defendant Duvall for placing Plaintiff in segregation in retaliation for filing grievances.

**Count 2:** Eighth Amendment claim against Defendant Vanderhove for the use of excessive force.

**Count 3:** An Eighth Amendment claim against Lieutenant Coffee for use of excessive force

**Count 4:** An Eighth Amendment deliberate indifference claim against Lieutenant Pierce and Correctional Officer Martin for disregarding a known risk of suicide

**Count 5:** An Eighth Amendment claim against Lieutenant Pierce and Correctional Officer Martin for use of excessive force

**Count 6:** An Eighth Amendment claim against Correctional Officer Menendez and Correctional Officer Mayer for use of excessive force

**Count 7:** Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claim against Vanderhove for ignoring O'Quinn's disabilities and denying him the use of his cane when escorting him through Pinckneyville.

**Count 8:** An Eighth Amendment deliberate indifference claim against Counselor Eldridge for refusing to help Plaintiff with his medical injuries and grievance procedure.

**Count 9:** An Eighth Amendment conditions of confinement claim against Duvall for refusing to move Plaintiff from a cell covered in fecal matter and urine.

Counts 1 and 2 listed above were previously screened by the Court pursuant to §1915A; therefore the Court will not analyze these claims again. These claims survive screening in accordance with the Court's previous ruling (*See* Doc. 12). The Court does wish to note, however, that Plaintiff's missing pages include more information expanding the details of his retaliation claim against Defendant Duvall and excessive force claim against Defendant Vanderhove. Plaintiff describes that a variety of prison officials thwarted his abilities to officially file grievances and work his way through the appropriate grievance steps, and while these descriptions could be helpful for the issue of exhaustion of administrative remedies, none of Plaintiff's descriptions rise to the level of being a claim in and of themselves. Lastly, Plaintiff describes issues he faced while attempting to seek medical treatment for his injuries; however, he did not list any of the medical care providers as Defendants in this case. Accordingly, the Court will not analyze any potential claims against those medical providers. Plaintiff brings the following additional claims in his amended Complaint:

### Counts 3, 5, and 6 — Excessive Force

The Eighth Amendment's proscription on cruel and unusual punishment extends to prohibit the use of excessive force on prisoners. The use of force is excessive when it involves the unnecessary and wanton infliction of pain. *See Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 667 (7th Cir. 2012). When prison officials are accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Several factors are relevant to this determination,

including the need for force, the amount of force applied, the threat a guard reasonably perceived, the effort made to temper the severity of the force used and the extent of the injury caused to the prisoner. *See Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

Plaintiff alleges that Defendants Vanderhove, Coffee, Pierce, Menendez, and Mayer assaulted him at different times during his time at Pinckneyville. Specifically, Plaintiff alleges that on July 5, 2017, Coffee pulled his handcuffs and would not allow Plaintiff to use his ADA cane. These allegations are not sufficient for Count 3 to proceed against Coffee and they are dismissed without prejudice.

Plaintiff also alleges that Pierce was present for the assault previously detailed in the Court's first threshold review (Doc. 12, p. 5). Specifically on or around September 27, 2017, Vanderhove and Pierce used excessive force by unnecessarily twisting Plaintiff's handcuffs and arms, and dragging him through Pinckneyville. Vanderhove and Pierce beat Plaintiff while waiting for a mental health professional to arrive and slammed his head against a door when entering the crisis unit. They twisted his handcuffs, grinding them into Plaintiff's skin until he bled. These allegations are sufficient for Count 1 and Count 5 to proceed against Vanderhove and Pierce, respectively. *See Wilkins v. Gaddy,* 559 U.S. 34 (2010); *DeWalt v. Carter,* 224 F.3d 607, 619 (7th Cir. 2000).

Finally, Plaintiff alleges that on or around October 28, 2017, Menendez and Mayer dragged him by a dog chain throughout Pinckneyville before assaulting him in his cell by pulling on the dog chain and attacking him, creating deep cuts on his skin and

fracturing his forearm. These allegations are sufficient for Count 6 to proceed against Menendez and Mayer.

### Count 4—Deliberate Indifference to a Known Risk of Suicide

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). To state a claim, a prisoner must show that: (1) he suffered from an objectively serious medical need; and (2) state officials acted with deliberate indifference to the prisoner's medical need, which is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Plaintiff describes that he warned both Pierce and Martin that he was suicidal, and they refused to help him. Soon after warning them, he tried to commit suicide. These allegations are sufficient for Count 4 to proceed against Pierce and Martin.

### Count 8— Deliberate Indifference—Counselor Eldridge

As stated previously, to state a claim for deliberate indifference, a prisoner must show that: (1) he suffered from an objectively serious medical need; and (2) state officials acted with deliberate indifference to the prisoner's medical need, which is a subjective standard. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that he spoke with Counselor Eldridge to file complaints and/or grievances about his lack of access to medical care after being assaulted by Pierce,

Vanderhove, and Martin. Counselor Eldridge refused to help Plaintiff because Pierce, Vanderhove, and Martin are her "friends." Plaintiff describes that his injuries from these assaults are long-lasting, and impact his ability to write. He describes being in chronic pain. Accordingly, this allegation is sufficient to proceed against Counselor Eldridge.

### Count 9—Conditions of Confinement

The Eighth Amendment prohibition on cruel and unusual punishment forbids the unnecessary and wanton infliction of pain. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)(citation omitted). To succeed on a claim related to conditions of confinement, a plaintiff must establish both an objective and subjective element. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). As to the objective element, a prisoner must establish that the conditions deny him "the minimal civilized measure of life's necessities," creating an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To do so, he must show that the conditions resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care, sanitation, or physical safety. *See Rhodes*, 452 U.S. at 347.

The subjective component of a claim for unconstitutional conditions of confinement requires demonstrating that a defendant had a culpable state of mind, that is that a defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner. *See Farmer*, 511 U.S. at 837, 842. While mere negligence does not amount to a constitutional violation, a plaintiff satisfies the deliberate indifference standard by showing that a prison official acted, or failed to act, despite the official's knowledge of a substantial risk of serious harm from the alleged unconstitutional conditions. *See Farmer*,

511 U.S. at 842; *Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). That is, prison officials must act to prevent "unreasonable peril" or to address "preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016).

Plaintiff alleges that he was placed in a cell covered in feces and was forced to use a mattress also covered in feces and urine. When he alerted Duvall to the issue, Duvall responded by stating, essentially, that he did not care and refused to move Plaintiff to a cell not covered in excrement. Accordingly, this allegation is sufficient to proceed against Duvall.

### Count 7—Claim Under the ADA and RA

Lastly, Plaintiff appears to be alleging claims related to the Americans with Disabilities Act, 42 U.S.C. 21312 ("ADA"), and the Rehabilitation Act of 1973 ("RA"), as he describes instances when prison officials refused to allow him to use his ADA cane and have access to an ADA shower, for example. As the Court previously noted, individual employees of IDOC cannot be sued under the ADA or RA; the proper defendant is the relevant state department. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012). According to the Proposed Second Amended Complaint, IDOC has provided Plaintiff with reasonable accommodations for his disabilities by providing permits and a cane. Accordingly, Plaintiff's claims related to the ADA and Rehabilitation Act are dismissed.

Plaintiff's motion for leave to file a second proposed amended complaint is **GRANTED,** adding five Defendants and five additional claims.

## SEVERANCE

As part of the screening process, the Court must assess whether the claims against the various parties may properly proceed together in the same action, in consideration of Federal Rule of Civil Procedure 20. Under Rule 20(a)(2),[4] a "plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all." Wright, Miller, & Kane, 7 Federal Practice & Procedure Civ. 3d § 1655 (West 2017); FED. R. CIV. P. 20(a)(2). The Seventh Circuit instructs that unrelated claims against different defendants belong in separate lawsuits, "not only to prevent the sort of morass" produced by multi-claim, multi-defendant suits "but also to ensure that prisoners pay the required filing fees" under the Prison Litigation Reform Act. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (citing 28 U.S.C. § 1915(b), (g)). Severance of unrelated claims is encouraged, and the Seventh Circuit has warned district courts not to allow inmates "to flout the rules for joining claims and defendants, *see* FED. R. CIV. P. 18, 20, or to circumvent the Prison Litigation Reform Act's fee requirements by combining multiple lawsuits into a single complaint." *Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017). *See also Wheeler v. Talbot*, 695 F. App'x 151, 152 (7th Cir. 2017) (district court should have severed unrelated and improperly joined claims or dismissed one of them).

---

[4] Rule 20, which governs joinder of parties in a single action, must be satisfied before the Court turns to the question of whether claims are properly joined under Rule 18. *Intercon Research Assoc's, Ltd. v. Dresser Industries, Inc.*, 696 F.2d 53, 57 (7th Cir. 1982); Wright, Miller, & Kane, 7 Federal Practice & Procedure Civil 3d § 1655 (West 2017). Rule 18 allows a plaintiff to join in one action as many claims as it has against an opposing party.

Consistent with *George*, *Owens*, and *Wheeler*, improperly joined parties and/or claims shall be severed into new cases, given new case numbers, and assessed separate filing fees. Each of the claims in Counts 1-9 arose from distinct incidents, which occurred at various times over a nearly a six-month period. While some of the Defendants and their actions overlap, Plaintiff includes no factual allegations to plead that Defendants acted in concert to violate his rights. At one point, Plaintiff mentions that Counselor Eldridge refused to help him with his claims again Pierce, Vanderhove, and Martin because they were Eldridge's friends, but that is the only time Plaintiff alleges that these incidents are related. Thus, there is no basis to conclude that the various incidents in Counts 1-9 were part of the same transaction/occurrence or series of transactions/occurrences.

Under Rule 20, each of these distinct claims belongs in a separate lawsuit. Applying Federal Rule of Civil Procedure 18, however, Counts 1 and 9 may proceed together in a single action because both are against Duvall. Likewise, Counts 2, 4, 5, and 8 may proceed in a single action because they are against Vanderhove, Pierce, Martin, and Eldridge for claims arising around the same time and could be potentially related based on the aforementioned fact pled by Plaintiff. Finally, Count 6 will proceed in a separate case against Mayer and Menendez.

### MOTION FOR PRESERVATION OF EVIDENCE

Plaintiff also filed a motion requesting that all video evidence from September 20, 2017 through January 30, 2018 in Units 6A and B wings; outside and inside of the H.C.U. (Health care unit); and unit 5 B&C wings inside and outside of the building at Pinckneyville be preserved (Doc. 21). Federal Rule of Civil Procedure 37(e) outlines that

a party must preserve documents and electronically-stored information when it reasonably anticipates litigation. As this matter was filed in 2019 and Plaintiff contends he filed both formal grievances and alerted prison officials informally about his concerns outlined in this lawsuit before filing, Defendants are aware they must preserve evidence in accordance with Fed. R. Civ. P. 37(e). Accordingly, Plaintiff's motion is denied as **MOOT**. The Court notes that Plaintiff filed a similar motion along with his original complaint, which the Court addressed in its threshold Order (*see* Doc. 12, pp. 6-7), determining that Plaintiff's request was denied as MOOT. As this is the second time the Court has addressed this issue with Plaintiff, should Plaintiff file another motion for preservation of this evidence, it will be summarily denied as MOOT without further explanation for purposes of judicial economy and efficiency.

## CONCLUSION

For the aforementioned reasons, Plaintiff's motion for leave to file a second amended complaint is **GRANTED**. The Clerk of Court is **DIRECTED** to file Plaintiff's proposed amended complaint as the Second Amended Complaint. Defendants' motion for summary judgment on the issue of exhaustion is **DENIED without prejudice** and Defendants are **GRANTED LEAVE** to refile their motion after reviewing the second amended complaint. Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Second Amended Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). Pursuant to Administrative Order No. 244, Defendants ***need only respond to*** the issues stated in the original Merit Review Order (Doc. 12) and in this Order.

**IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure 20(a)(2), Plaintiff's Count 1 and 9 will proceed in this matter against Defendant Duvall. Defendant Vanderhove shall be **TERMINATED** from this action. Plaintiff's claims in Counts 2-8 are severed into two new cases as follows:

**Severed Case 1:**   Counts 2, 4, 5, and 8 against Vanderhove, Pierce, Martin, and Eldridge.

**Severed Case 2:**   Count 6 against Menendez and Mayer.

In each new case, the Clerk is **DIRECTED** to file the following documents: (1) This Memorandum and Order, (2) Plaintiff's Second Amended Complaint and Exhibits, (3) Plaintiff's motion to proceed *in forma pauperis* ("IFP"), and (4) Plaintiff's prisoner trust fund account statement. Plaintiff will be responsible for an additional $350.00 filing fee in each new case.[5]

Defendant Duvall is hereby **ORDERED** to file an appropriate responsive pleading to the Second Amended Complaint in a timely manner and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants only need to respond to the issues stated in this Merit Review Order.**

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any changes in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not

---

[5] The filing fee is $350.00 for a plaintiff who is granted leave to proceed *in forma pauperis* ("IFP"). If IFP status is denied, the filing fee is $400.00, which includes a $50.00 administrative fee assessed in non-IFP civil cases. *See* Judicial Conference Schedule of Fees - District Court Miscellaneous Fee Schedule, 28 U.S.C. § 1914, No. 14.

later than 7 days after a transfer or other change in address occurs. Failure to comply with this Order will cause a delay in transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).


**IT IS SO ORDERED.**

**DATED: November 13, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**